UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EXECUTIVE TRIM CONSTRUCTION, INC., d/b/a
Executive Group,

                                                            1:25-cv-369 (BKS/PJE)

                          Plaintiff,

v.

SHANE RICHARDSON and CLAYPOOL HOLDINGS
LLC, d/b/a Merric Millwork & Seating, A Missouri
Limited Liability Company,

                          Defendants.
_____

**Appearances:**

*For Plaintiff*:
Trevor J. Telisky
Cooper Erving & Savage LLP
20 Corporate Woods Boulevard, Suite 501
Albany, New York 12211

*For Defendant Shane Richardson:*
Conor Lynch
Jennifer Marie Yetto
Jon E. Crain, Jr.
Whiteman Osterman & Hanna LLP
One Commerce Plaza
Albany, New York 12260

*For Defendant Claypool Holdings LLC:*
Kelly D. Schneid
Leslie Ann Berkoff
Moritt Hock & Hamroff LLP
400 Garden City Plaza
Suite 202
Garden City, New York 11530

**Hon. Brenda K. Sannes, Chief United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

**I.      INTRODUCTION**

Plaintiff Executive Trim Construction, Inc. ("Executive") initiated this action on March 25, 2025, against Defendants Shane Richardson and Claypool Holdings LLC, doing business as Merric Millwork & Seating ("Merric"), asserting claims for misappropriation of trade secrets, including in violation of 18 U.S.C. § 1030 and 18 U.S.C. §§ 1830–1836, interference with prospective economic relations, slander, and other tortious conduct. (Dkt. No. 1). Presently before the Court is Plaintiff's motion for a temporary restraining order and preliminary injunction. (Dkt. No. 3). The motion is fully briefed. (Dkt. Nos. 3, 14, 16). The Court heard oral argument on April 15, 2025. Following argument, the Court denied Plaintiff's motion for a temporary restraining order and advised the parties that a written decision would follow. For the following reasons, the motion for a temporary restraining order and preliminary injunction is denied.[1]

**II.     FACTS**[2]

Executive is a corporation specializing "in the production and installation of millwork, together with warehousing, production and installation of furniture, fixtures, and equipment, operating supplies and equipment, and more generally, the buildout of hospitality business

---

[1] During oral argument, Plaintiff did not seek to present any additional evidence in support of the preliminary injunction motion; Plaintiff instead sought to proceed with discovery. Accordingly, the Court's ruling extends to the motion for both the temporary restraining order as well as the preliminary injunction.

[2] The facts are taken from the affidavits and exhibits the parties submitted in connection with this motion. *See J.S.G. ex rel. J.S.R. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits . . . given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017); *see also Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

2

enterprises." (Dkt. No. 3-1, ¶ 5). Executive has "more than 100 employees and service[s] projects up and down the east coast." (*Id.* ¶ 6).[3] Lance Orcutt, Executive's Chief Executive Officer, hired Defendant Shane Richardson as Director of Business Development in Executive's Sales Department in August 2020. (*Id.* ¶¶ 1, 3). Richardson reported to Orcutt directly on a day-to-day basis. (*Id.* ¶ 4).

In an affidavit submitted in support of the motion for injunctive relief Orcutt explains that the nature of Executive's business requires "a familiarity with millwork, manufacturing & installation processes for hotel and hospitality environments." (*Id.* ¶ 7). Executive bids for projects, and that requires "analysis of the product as well as cost structure for working in highly concentrated metropolitan centers." (*Id.* ¶ 11). "The cost structure on bidding information is proprietary, sensitive and includes matters that are of great competitive value to Executive." (*Id.* ¶ 13).

Richardson tendered his resignation as an employee in a letter dated November 30, 2024. (*Id.* ¶ 8). In his affidavit, Orcutt asserts that prior to this tender of resignation "Mr. Richardson utilized his Executive e-mail domain . . . to intentionally divert prospective Executive business to his new employer and named party co-Defendant herein, Merric." (*Id.* ¶ 14). Specifically, Orcutt contends that Richardson diverted Executive customer Coastal Construction to Merric. (*Id.* ¶ 19). Orcutt also states that Richardson "communicated to current Executive customers that he had 'concerns' about the financial solvency of [the] company, and [the] company's ability to meet its debt obligations," and made these statements "with the intent to financially harm Executive." (*Id.* ¶¶ 15, 17). Orcutt further asserts that after Richardson made statements of this nature to Coastal

---

[3] Richardson asserts that Boston, Washington, D.C., and New York City were Executive's primary markets. (Dkt. No. 16-1, ¶ 22).

3

Construction, Coastal Construction transmitted to Executive a sub-contract change order requiring Executive to post a payment and performance bond in the sum of $16,695.00, for a contract value of $1,112,969.00. (*Id.* ¶¶ 17–18). Lastly, Orcutt states that "[o]n information and belief, Mr. Richardson also provided Executive's bid information to Merric without . . . authorization or knowledge." (*Id.* ¶ 20).

Richardson submitted a declaration explaining that at Executive he was "responsible for preparing bids for projects," which he did by "calculat[ing] prices through calling subcontractors and vendors, compil[ing] relevant information, . . . obtain[ing] material from various providers[,] [and] utiliz[ing] the information that [he] gathered [him]self [to] calculate[] a bid based on [his] knowledge and decades-long experience as an estimator." (Dkt. No. 16-1, ¶ 15). Executive never provided Richardson with a formula, software, or estimating system to prepare bids. (*Id.* ¶¶ 17–18). No one at Executive ever informed Richardson that his bidding process was a trade secret, confidential, or proprietary information not to be disclosed and no one treated his bidding process with any form of secrecy or discretion. (*Id.* ¶ 21). Richardson brought Coastal Construction on as a client when he joined Executive. (*Id.* ¶ 23). He also brought his "personal list of clients, contractors, subcontractors, and vendors" to Executive. (*Id.* ¶ 24).

Richardson explained that in the fall of 2024, he began noticing "challenges that Executive Group seemed to be facing." (*Id.* ¶ 26). Richardson decided it was in the best interest of his career to look for new employment to avoid any risk of layoffs or delayed compensation. (*Id.* ¶ 36). Richardson met with Dan Claypool, Owner and Chief Executive Officer of Merric, a company in the same line of business as Executive, about a potential job opportunity. (Dkt. No. 14-4, ¶¶ 1, 5, 7–9). During this meeting, Richardson informed Claypool that if he were to leave Executive, "he would neither bring a book of business with him nor attempt to solicit Executive

4

Trim's existing customers to follow him." (*Id.* ¶ 9). However, Richardson advised that Coastal Construction would likely follow him, because they had previously followed him and Richardson was good friends with Brian Lacusky, a Coastal Construction executive. (*Id.*).[4] Richardson subsequently emailed Lacusky from his Executive email account, copying Claypool, in regard to getting Merric pre-qualified to potentially serve as a "back-up contractor" for a project Plaintiff had contracted with Coastal Construction to perform in Tampa, Florida, ("the Tampa project") given Coastal Construction's concerns with "Plaintiff's performance." (Dkt. No. 14-5, at 6; Dkt. No. 14-4, ¶ 10; *see* Dkt. No. 3-1, ¶¶ 14, 19). Richardson also sent "Coastal's Boilerplate Subcontract, and applicable Exhibits" to Claypool for review. (Dkt. No. 14-6, at 2–3; *see* Dkt. No. 14-4, ¶ 11).

According to Richardson, Coastal Construction asked him directly on a phone call[5] whether he was aware of liens on the project or instances of Executive not paying its creditors and Richardson answered "honestly, narrowly, and based only on the facts" and then shared the contents of the call with Orcutt. (Dkt. No. 16-1, ¶ 32). Richardson affirms that he "never brought any trade secrets or proprietary information from Executive Group to Merric." (Dkt. No. 16-1, ¶ 47).

After Richardson resigned from Executive on November 30, 2024, he assumed his role as Merric's Director of Development in mid-December 2024. (Dkt. No. 14-4, ¶¶ 12–13). Dan Claypool, Merric's Owner and CEO, submitted a declaration in opposition to the motion for injunctive relief. Claypool explained that in the time since Richardson assumed his position,

---

[4] Richardson states that he "developed a professional relationship with Coastal Construction" in or around 2018, predating Richardson's employment with Executive, and that "Coastal Construction has followed [him] from employer to employer. (Dkt. No. 16-1, ¶¶ 2, 14).

[5] Neither party provides a timeframe for when this phone call occurred, but Richardson confirms that it was while he was still in Executive's employ. (*See* Dkt. No. 16-1, ¶ 32).

Merric submitted several bids to Coastal Construction in connection with "different projects," but none in connection with the Tampa project. (Dkt. No. 14-4, ¶ 14). Richardson had no role in preparing these bids and provided no insight or resources in connection to the bids. (*Id.*). Merric "used its standard forms, formulas, experience, and knowledge to price each of the bids submitted." (*Id.*). Coastal Construction has not accepted any of Merric's bids or awarded Merric any work to date. (*Id.* ¶ 15). Claypool affirms that Merric has "never received, let alone used, any confidential or proprietary information belonging to Executive Trim." (*Id.* ¶ 16).

### III.    DISCUSSION

#### A.    Standard of Review

Rule 65 of the Federal Rules of Civil Procedure governs the issuance of temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for issuance of a temporary restraining order is the same as the standard for a preliminary injunction. *Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). In general, a party seeking a preliminary injunction must demonstrate: (1) a likelihood of irreparable injury in the absence of an injunction; (2) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor or, if relying on the presence of sufficiently serious questions, that the balance of hardships tips decidedly in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015); *see also N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "[A] preliminary injunction is 'an

extraordinary remedy never awarded as of right[,]'" *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)), and "should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139–40 (2d Cir. 2007) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original)).

Generally, preliminary injunctions are prohibitory or mandatory. *N. Am. Soccer League*, 883 F.3d at 36. "Prohibitory injunctions maintain the status quo pending resolution of the case; mandatory injunctions alter it." *Id.* The "status quo . . . is[] 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id.* at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)). A party seeking a mandatory injunction "must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civ. Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). "A heightened 'substantial likelihood' standard may also be required when the requested injunction (1) would provide the plaintiff with 'all the relief that is sought' and (2) could not be undone by a judgment favorable to defendants on the merits at trial." *Mastrovincenzo v. City of New York*, 435 F.3d 78, 90 (2d Cir. 2006) (quoting *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995)).

Here Executive seeks an injunction prohibiting the Defendants from utilizing "any information transmitted by Mr. Richardson to Defendant Merric with regard to client lists, contracts, bidding documents and other proprietary information" of Executive Trim; "to segregate and safeguard all such documents for filing" with the Court; to disgorge any income "attributable to the breach of fiduciary duty and misappropriation of trade secrets"; and "against future defamatory statements." (Dkt. No 3-3, at 2; Dkt. No. 3-2, at 9). Because Executive is

seeking to preserve the status quo, the injunctive relief Plaintiff seeks is prohibitory, and therefore not subject to the heightened legal standard.

**B.     Analysis**

**1.     Irreparable Harm**

Plaintiff argues that it faces irreparable harm in the form of "untold economic and goodwill damages," because Richardson (1) misappropriated proprietary documents, (2) intentionally diverted new work and bid requests to Merric, and (3) slandered Executive to existing clients. (Dkt. No. 3-2, at 6–7). Plaintiff argues that Richardson's "statements, potentially coupled with lost bid opportunities caused by Defendant Merric bidding projects with Executive's client Coastal Construction" constitutes irreparable harm. (*Id.* at 7). Defendants respond that Executive's damages, if any, "are remote and speculative, and can be compensated by money damages." (Dkt. No. 14, at 11; Dkt. No. 16, at 13–15).

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)); *see also Doe v. Rensselaer Polytechnic Inst.*, No. 18-cv-1374, 2019 WL 181280, at *2, 2019 U.S. Dist. LEXIS 5396, at *4 (N.D.N.Y. Jan. 11, 2019), and "[i]n the absence of a showing of irreparable harm, a motion for a preliminary injunction should be denied," *Rodriguez*, 175 F.3d at 234. "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of N. Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final

adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (footnote omitted).

Here, any harms alleged are not imminent, but rather, speculative at best. Plaintiff alleges that Defendant Richardson "divert[ed] prospective business from Executive to Defendant Merric," (Dkt. No. 1, ¶ 12), and argues that the reputational harm "*potentially* coupled with lost bid opportunities" constitutes irreparable harm, (Dkt. No. 3-2, at 7 (emphasis added)). However, there is no evidence of any diversion of prospective business to Merric. (Dkt. No. 14-4, ¶¶ 9–11, 14–16; Dkt. No. 16-1, ¶¶ 40–47). To the extent Plaintiff focuses its concerns on Coastal Construction, the record reflects that Defendant Merric has only submitted three bids to Coastal Construction since Defendant Richardson began working there; that none of those bids were in Executive's primary markets; and that Coastal Construction did not accept any of the bids submitted by Merric. (Dkt. No. 16-1, ¶¶ 43–46). That Plaintiff could "potentially" lose bid opportunities as a result of Defendants' actions is speculative, and there is no evidence that Plaintiff has lost any business opportunities. "[N]onspecific references to [potential harms] and speculative claims . . . are not the sort of 'actual and imminent' injury sufficient to justify a preliminary injunction." *St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C.*, 131 F.4th 102, 107 (2d Cir. 2025) (quoting *Tom Doherty Assocs.*, 60 F.3d at 37–38).

Furthermore, in a similar action brought by Plaintiff against another former employee, this Court noted:

> In the trade secret and loss of business context, courts have found that irreparable harm can result where the business relationship would otherwise have produced an indeterminate amount of business in years to come. Where there is no allegation concerning an ongoing/indeterminate loss, however, courts regularly find that money damages are sufficient and decline to award injunctive relief.

9

*Executive Trim Construction, Inc. v. Gross*, No. 20-cv-544, 2020 WL 5232049, at *6, 2020 U.S. Dist. LEXIS 160039, at *18 (N.D.N.Y. Sept. 2, 2020) (citations omitted). In that case, "several facts undercut the claimed irreparable harm," including that (1) the defendant corporation attested that it was not bidding on any projects where the individual defendant disclosed confidential information, (2) the plaintiff could be made whole by an award of money damages if the defendant corporation received a contract award by underbidding the plaintiff, and (3) the alleged harm was speculative. *Gross*, 2020 WL 5232049, at *6–7, 2020 U.S. Dist. LEXIS 160039, at *19–21.

Here, the risk of irreparable harm is even lower than *Gross* because there is no evidence that Richardson disclosed trade secrets or proprietary sensitive information to Merric. *Cf. Gross*, 2020 WL 5232049, at *6, 2020 U.S. Dist. LEXIS 160039, at *19 (noting that the former employee disclosed the plaintiff's bids on several projects to his new employer). While Orcutt asserts that "[o]n information and belief" Richardson "provided Executive's bid information to Merric without our authorization or knowledge," (Dkt. No. 3-1, ¶ 20), Richardson affirmed that while he was at Executive he was never told that the bidding process was "a trade secret, confidential, or proprietary information not to be disclosed," and no one at Executive treated his "bidding process with any form of secrecy or discretion." (Dkt. No. 16-1, ¶ 21). And Merric's CEO affirmed that "Merric Millwork never received, let alone used, any confidential or proprietary information belonging to Executive Trim and certainly never used such information when submitting any bids to any existing or potential customer." (Dkt. No. 14-4, ¶ 16).

Accordingly, the Court finds that Plaintiff has failed to demonstrate that irreparable harm will likely result in the absence of injunctive relief.

## 2. Likelihood of Success[6]

Plaintiff argues that "there is a likelihood of success on the merits," because "[t]he annexed Affidavit of Lance Orcutt clearly sets forth that Defendant, Mr. Richardson, without authority, intentionally diverted an Executive client, Coastal Construction, and transmitted proprietary documents to his new employer Defendant Merric." (Dkt. No. 3-2, at 8). Defendant Richardson argues that "Executive fails to establish a likelihood of success on its claims supporting the TRO application, all of which are premised on alleged misappropriation of protected trade secrets," because "this information is not a trade secret." (Dkt. No. 16, at 9, 12). Defendant Merric argues that none of the three causes of action against it "have any likelihood of success." (Dkt. No. 14, at 11).

"To establish a likelihood of success on the merits, a plaintiff must show that he is more likely than not to prevail on his claims, or, in other words, that the 'probability of prevailing is better than fifty percent.'" *Doe v. Vassar Coll.*, No. 19-cv-9601, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *20 (S.D.N.Y. Nov. 21, 2019) (quoting *BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000)). However, a party may also prevail by showing "a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor." *Id.*, 2019 WL 6222918, at *7, 2019 U.S. Dist. LEXIS 203418, at *21 (quoting *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010)). This allows a district court to grant injunctive relief

---

[6] Plaintiff alleges that "Mr. Richardson, by his statements to others, did engage in slander per se and defamation as against the Plaintiff." (Dkt. No. 1, ¶ 28). Plaintiff's moving papers do not address the likelihood of success on the merits of this claim, (*see* Dkt. No. 3-2), and as such, the Court declines to address it. *See Gross*, 2020 WL 5232049, at *7 n.1, 2020 U.S. Dist. LEXIS 160039, at *22 n.1. The Court notes, however, that in any event, Richardson agreed "not to say anything to third parties about Executive's financial insolvency while this action is pending," ((Dkt. No. 16, at 9 n.3). The Court also declines to address Plaintiff's likelihood of success on its cause of action under 18 U.S.C. § 1030, (Dkt. No. 1, ¶¶ 38–40), as the claim is not the basis for the injunctive relief sought, (*see* Dkt. No. 3-3).

11

"where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *See Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010).

### a.  Trade Secret

The complaint alleges that Defendant Richardson "disclose[d] confidential business information and trade secrets" to Defendant Merric, (Dkt. No. 1, ¶ 21), diverted "corporate information and bidding documents, as well as other sensitive corporate proprietary information" and trade secrets, (*id.* ¶ 25), and breached his "duty to not use or disclose [Plaintiff's] proprietary secrets," (*id.* ¶¶ 35–36). Plaintiff further alleges under the federal Defend Trade Secrets Act ("DTSA") that "the Defendants jointly and severally did violate 18 U.S. Code §1830-§1836 *et seq.*, by engaging in the utilization of computers owned by the Plaintiff and by misappropriating trade secrets and confidential proprietary information from said computers and utilizing them to improperly and illegally obtain proprietary information." (*Id.* ¶ 44). Defendant Richardson argues that he did not misappropriate any trade secrets. (Dkt. No. 16, at 9–13). Defendant Merric similarly argues that the bid information does not constitute a trade secret and that even if it did, Merric has not used any bid information Defendant Richardson may have possessed. (Dkt. No. 14, at 16–19).

Plaintiff argues that Mr. Richardson "misappropriated trade secrets in violation of both New York common law and federal law." (Dkt. No. 3-2, at 8). "The requirements for showing a misappropriation of a trade secret are similar under state and federal law." *In re Document*

*Techs. Litig.*, 275 F. Supp. 3d 454, 461 (S.D.N.Y. 2017).[7] Under New York common law, "[a] plaintiff claiming misappropriation of a trade secret must prove that (1) 'it possessed a trade secret,' and (2) the trade secret was used by defendant 'in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" *Universal Instruments Corp. v. Micro Sys. Eng'g, Inc.*, 924 F.3d 32, 49 (2d Cir. 2019) (citation omitted). A "trade secret" is "any formula, pattern, device or compilation of information which is used in one's business, and which gives [one] an opportunity to obtain an advantage over competitors who do not know or use it." *E.J. Brooks Co. v. Cambridge Sec. Seals*, 31 N.Y.3d 441, 453 (2018) (citation omitted). In determining whether information constitutes a trade secret, New York courts have considered:

> (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 117 (2d Cir. 2009) (citation omitted).

The complaint identifies bid calculations as the trade secret. (Dkt. No. 1, ¶ 10). "Data relating to pricing can constitute a trade secret under some circumstances." *Free Country Ltd v. Drennen*, 235 F. Supp. 3d 559, 566-67 (S.D.N.Y. 2016) (citing *In re Dana Corp.*, 574 F.3d 129, 152 (2d Cir. 2009)). "However, this is generally where a company uses some type of proprietary formula that gives it a unique advantage, such as a complex pricing or trading algorithm in a financial business." *Id.* at 567 (citations omitted). "On the other hand, information relating to [a

---

[7] Because the requirements are similar and because Plaintiff did not brief the DTSA claim using federal standards, the Court evaluates Plaintiff's claims under New York state law.

company's] underlying mechanics, such as the prices of materials and costs of manufacturing, are not trade secrets because 'any seller's publicly-available prices signal to competitors some information about the underlying mechanics of the seller's pricing structure.'" *Id.* (citations omitted).

On this record, Plaintiff has failed to show that it is likely to succeed on its trade secret claim concerning the bid process. The complaint contains the conclusory allegation that bid "calculations have been developed by Plaintiff after years of first-hand experience and constitute trade secrets," and knowledge of them "would not be known to people outside the business and is limited to specific individuals who procure the jobs to be bid and calculate the bid amounts." (Dkt. No. 1, ¶ 10). According to Plaintiff, these calculations are "guarded against disclosure to anyone else" and are "proprietary to Plaintiff." (*Id.*). And although Plaintiff argues that "Mr. Orcutt's Affidavit clearly addresses each of the six factors . . . to demonstrate that Defendant, Mr. Richardson, misappropriated trade secrets," (Dkt. No. 3-2, at 8), Orcutt's affidavit provides few factual details. Orcutt states only that Executive has "a familiarity with the cost structure," which is essential knowledge for calculating bids and that the "cost structure on bidding information is proprietary, sensitive and includes matters that are of great competitive value to Executive." (Dkt. No. 3-1, ¶¶ 11–13).

Furthermore, there is evidence that Plaintiff uses prices of materials, manufacturing costs, and knowledge of the worksite and labor force to calculate its bids. (Dkt. No. 1, ¶ 9; *see also* Dkt. No. 16-1, ¶¶ 15–21 (affidavit from Richardson describing bid preparation process at Executive)). According to Richardson, there was no formula, software or estimating system at Executive and no one there treated his "bidding process with any form of secrecy or discretion." (Dkt. No. 16-1, ¶¶ 17–18, 21). Merric's CEO affirmed that "bid calculations . . . do not have

independent value as competitors can duplicate calculations based on common industry knowledge and experience." (Dkt. No. 14-4, ¶ 17). "In fact, similarly-sized companies, like Merric Millwork and Executive Trim . . . all submit very similar bids on projects as they are all subject to the same costs for materials and local labor." (*Id.*).

In *Gross*, Executive described its bid calculations as a trade secret in the same manner as it does in this action and the court rejected the claim. 2020 WL 5232049, at *8, 2020 U.S. Dist. LEXIS 160039, at *23–24 (recounting evidence that Executive's "final bids are generated by combining labor rates, overhead, warehouse storage, handling, driver costs, trucking costs, etc."). The *Gross* court noted that the information was "not as 'unique' as Plaintiff would like the Court to believe" because "all businesses in this field necessarily rely on the same types of information to generate bids for projects." *Id.* Ultimately, "[t]hese basic underlying costs, which are combined to determine the final bid price, are not the type of information that is generally afforded trade secret protection." *Id.* (citing *Free Country Ltd.*, 25 F. Supp. 3d at 566–67); *cf. PLC Trenching Co., LLC v. Newton*, 11-cv-515, 2011 WL 13135653, at *4, 2011 U.S. Dist. LEXIS 165366, at *11–12 (N.D.N.Y. Dec. 12, 2011) (finding the plaintiff had "adduced sufficient evidence" to establish a likelihood of success on its trade secret claim, where it showed, *inter alia*, that "the information is not known widely (if at all) outside of Plaintiff's business").

Furthermore, even assuming *arguendo* that the information at issue did constitute a trade secret, Plaintiff has failed to show a likelihood of success on the second element of this claim, *i.e.*, that Defendants used the information. *See Gross*, 2020 WL 5232049, at *8, 2020 U.S. Dist. LEXIS 160039, at *24. Merric argues that "there is no actual or circumstantial evidence that [Richardson] actually sent [Merric] any confidential information." (Dkt. No. 14, at 7). As

15

discussed above, Orcutt merely asserts "[o]n information and belief" that "Richardson also provided Executive's bid information to Merric without our authorization or knowledge." (Dkt. No. 3-1, ¶ 20).

On the other hand, Defendant Merric's CEO, Claypool, stated in his declaration that "Merric Millwork never received, let alone used, any confidential or proprietary information belonging to Executive Trim and certainly never used such information when submitting any bids to any existing or potential customer." (Dkt. No. 14-4, ¶ 16). In submitting bids to Coastal Construction "Merric Millwork used its standard forms, formulas, experience, and knowledge to price each of the bids submitted" and "Richardson had no role in preparing these bids and provided no insight or resources to Merric Millwork in connection therewith." (*Id.* ¶ 14). Defendant Richardson similarly affirmed under penalties of perjury that he is "not currently involved in estimating or preparing bids at Merric for Coastal Construction" and that he "never brought any trade secrets or proprietary information from Executive Group to Merric." (Dkt. No. 16-1, ¶¶ 43, 47). Defendant Richardson further affirmed that he "never provided Merric with client lists or lists developed while at Executive Group[;] [r]ather, a client relationship that [he] had brought with [him] to Executive Group independently made the determination to follow [him] to [his] new employer, Merric, of its own volition" and that "[t]o [his] knowledge, this decision has not resulted in any projects between Coastal Construction and Merric." (*Id.* ¶ 47). Accordingly, this case is unlike *Penrose Computer Marketgroup, Inc. v. Camin*, 682 F. Supp. 2d 202 (N.D.N.Y. 2010), cited by Plaintiffs, (Dkt. No. 3-2, at 8), because in *Penrose*, the plaintiff sufficiently plead that the defendant learned confidential information and then used that information to compete against plaintiff. 682 F. Supp. 2d at 214. Therefore, the Court finds that Plaintiff has not established that it is likely to succeed on its trade secret claim.

16

### b. Tortious Interference with Plaintiff's Prospective Economic Relations

Plaintiff alleges that "Mr. Richardson, together with Defendant Merric did engage in interference with prospective economic relations" because Richardson (1) directed Executive's client, Coastal Construction, to Merric and (2) provided Merric with confidential information and trade secrets that Merric used to make bids. (Dkt. No. 1, ¶¶ 32–33; Dkt. No. 3-1, ¶ 19). Defendants argue that Plaintiff cannot demonstrate a likelihood of success on this cause of action. (Dkt. No. 14, at 11–15; Dkt. No. 16, at 13).

"To state a claim for intentional interference with prospective economic advantage under New York law, a party must allege that: (i) the plaintiff had business relations with a third-party; (ii) the defendants interfered with those business relations; (iii) the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means; and (iv) the defendants' acts injured the relationship." *Executive Trim Constr., Inc. v. Gross*, 525 F. Supp. 3d 357, 372 (N.D.N.Y. 2021) (citations and internal quotation marks omitted). The third element requires the plaintiff to establish either that the defendant's conduct amounts to a crime or an independent tort or that the defendant has engaged in conduct for the sole purpose of inflicting intentional harm on the plaintiff. *Id.*

Here, the record does not support a likelihood of success on the element that the defendants acted for a wrongful purpose or used dishonest, unfair, or improper means. As explained above, Executive has failed to show a likelihood of success on its trade secret claim. With respect to Richardson's connection of Merric and Coastal Construction while he was still employed at Executive, Plaintiff claims that "Mr. Richardson utilized his Executive e-mail domain . . . to intentionally divert prospective Executive business to his new employer and named party co-Defendant herein, Merric," identifying the diverted client as Coastal

17

Construction. (Dkt. No. 3-1, ¶¶ 14, 19). Plaintiff did not submit these allegedly diversionary emails. Claypool, however, provided an email indicating that Richardson's introductory email was to get Merric pre-qualified as a "back-up contractor" in the event Plaintiff failed to perform on the Tampa project Executive was working on, not to divert business away from Plaintiff. (Dkt. No. 14-4, ¶ 10; Dkt. No. 14-5). Claypool attests that the only document Richardson shared with Merric was Coastal Construction's "public, boilerplate subcontract," not any "bid, subcontract, or other non-public document filled out by Plaintiff." (Dkt. No. 14-4, ¶ 11; Dkt. No. 14-6). Further, there is no evidence that Merric submitted any bids for the Tampa project, and Claypool states that Merric has not been awarded any work by Coastal Construction to date. (Dkt. No. 14-4, ¶¶ 14–15). "[N]ormal economic self-interest" is insufficient to satisfy the wrongful means element. *Gross*, 525 F. Supp. 3d at 374.

      Furthermore, the record also fails to support a finding that the Defendants' acts injured the relationship between Plaintiff and Coastal Construction. Plaintiff alleges its relationship with Coastal Construction was injured as a result of Defendants' actions because (1) Coastal Construction required Plaintiff to "post a payment and performance bond on a subcontract," (Dkt. No. 1, ¶ 17), and (2) Coastal Construction was diverted from Executive to Merric, (Dkt. No. 3-1, ¶ 19). However, on this record it is unclear as to whether Coastal Construction required the bond because of Defendants' actions or because of the liens that had been filed against Executive projects. (Dkt. No. 16-1, ¶ 30). Moreover, there are no allegations that Plaintiff lost bids as a result of Defendants' actions or that Coastal Construction has awarded any projects to Merric. Accordingly, the Court finds that Plaintiff has not demonstrated a likelihood of success on the merits on its tortious interference with economic relations cause of action.

### 3. Balance of Hardships and Public Interest

"[T]he balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)). Furthermore, "the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger*, 607 F.3d at 80.

Plaintiff's failure to demonstrate an irreparable injury and a likelihood of success on the merits is sufficient to deny injunctive relief. *See id.* at 75 n.5; *Faiveley*, 559 F.3d at 119. Accordingly, the Court need not consider the remaining balance of hardships and public interest factors. *Conn. State Police Union v. Rovella*, 36 F.4th 54, 68 (2d Cir. 2022) ("Because the District Court did not err in concluding that the [plaintiff] could not succeed on the merits of its claim, we need not address the remaining prongs of the preliminary injunction test, including whether the [plaintiff] demonstrated irreparable harm or whether an injunction would be in the public interest.").

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for a temporary restraining order and preliminary injunction, (Dkt. No. 3), is **DENIED**.

**IT IS SO ORDERED.**

Dated: May 20, 2025
Syracuse, New York

*/s/ Brenda K. Sannes*
Brenda K. Sannes
Chief U.S. District Judge